# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

DARIN LEE GAY,

           Plaintiff,

vs.                                              Case No. 3:09-cv-679-JRK

MICHAEL ASTRUE,
Commissioner of Social Security,

           Defendant.
_____/

## **OPINION AND ORDER**[1]

### **I. Status**

Darin Lee Gay ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI"). On January 17, 2007, Plaintiff filed an application for DIB and SSI. See Transcript of Administrative Proceedings ("Tr.") at 60; Memorandum in Support of Plaintiff's Position (Doc. No. 13; "Pl.'s Mem.") at 2. Plaintiff's alleged inability to work is based on an injury to his back he sustained during a work-related incident that occurred on December 6, 2004. Tr. at 15-16. An Administrative Law Judge ("ALJ") held a hearing on October 1, 2008 (Tr. at 7-48), and issued a decision on October 22, 2008, finding Plaintiff not disabled through the date of the decision. Tr. at 60-69. On May 22, 2009, the

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge, see Consent to Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 4), and the Order of Reference was entered on August 5, 2009 (Doc. No. 5).

Appeals Council denied Plaintiff's request for review. Tr. at 1-4. On July 22, 2009, Plaintiff commenced this action under 42 U.S.C. §§ 405(g) and 1333(c)(3) by timely filing a Complaint seeking review of the Commissioner's final decision. See Complaint (Doc. No. 1). Plaintiff has exhausted the available administrative remedies, and the case is properly before the Court.

Plaintiff, who was forty years old at the time of his hearing before the ALJ (Tr. at 15), raises three issues within his memorandum.[2] First, Plaintiff argues the ALJ failed to articulate adequate reasons for discounting the opinion of Plaintiff's treating physician regarding Plaintiff's residual functional capacity ("RFC"). Pl.'s Mem. at 20-22. Second, Plaintiff argues the ALJ failed to objectively evaluate or specifically articulate reasons for discrediting Plaintiff's pain testimony. Id. at 17-22. Third, Plaintiff argues the ALJ failed to include in the hypothetical to the vocational expert all the effects of Plaintiff's impairments and limitations. Id. at 22-23. After a thorough review of the entire record and consideration of the parties' respective memoranda, the undersigned finds the Commissioner's final decision is due to be reversed and remanded for further proceedings.

## II. Background

Plaintiff was thirty-six years old on December 6, 2004, the alleged onset date of an injury he suffered during a work-related incident. Tr. at 15. Since Plaintiff's alleged injury, he has not returned to work. Tr. at 20, 197, 204. Plaintiff has a "limited education" level, and his past relevant work includes working as a construction framer and tile setter. Tr. at 68.

---

[2] For ease of discussion, the undersigned presents the issues in a different order than that in Plaintiff's memorandum.

The day after Plaintiff's alleged injury occurred, Plaintiff reported to Memorial Walk-in and was given a prescription for Lortab and Soma. Tr. at 251. Plaintiff still experienced "debilitating pain and ultimately was referred to Dr. Gruber, a neurologist[,]" who subsequently referred Plaintiff to John S. Boggs, M.D. ("Dr. Boggs"). Tr. at 251.

Dr. Boggs administered two or three epidural injections and ordered Plaintiff to undergo physical therapy. Tr. at 191-98; 251. At that time, Plaintiff was taking Lortab and Robaxin. Tr. at 195. On April 8, 2005, Dr. Boggs referred Plaintiff to a surgeon because Plaintiff had "not been improved by any of the injections" and because Plaintiff believed the physical therapy "made him worse." Tr. at 195.

On April 29, 2005, Plaintiff reported to Paulo Monteiro, M.D. ("Dr. Monteiro") that he had been suffering "excruciating pain" ever since his alleged injury on December 6, 2004. Tr. at 232. Dr. Monteiro noted that an "MRI scan of the lumbrosacral spine, on 12-13-04, show[ed] L4-5 central disk herniation." Tr. at 233. On May 26, 2005, Plaintiff underwent a "L4-5 laminotomy and diskectomy[.]" Tr. at 224, 202. At a surgical follow-up appointment, Dr. Monteiro noted Plaintiff "has had quite extensive treatment before the surgery" and even after the surgery Plaintiff "remain[ed] in disabling pain." Tr. at 224. Dr. Monteiro informed Plaintiff that he could undergo a second surgery, but warned Plaintiff this surgery should only be performed if Plaintiff was in "disabling pain." Tr. at 224.

Plaintiff underwent a second surgery, "a L4-5 lumbar laminectomy with decompression, TLIF [360 degree fusion], and stabilization[,]" on September 21, 2005. Tr. at 234. In a report dated October 28, 2005, Dr. Monteiro noted Plaintiff was "taking way too much narcotics." Tr. at 221. Dr. Monteiro placed Plaintiff on "patches of Fentanyl" in hopes

of relieving Plaintiff's pain. Tr. at 221. While continuing to see Dr. Monteiro, Plaintiff went to the Metropolitan Pain Center on November 29, 2005, and began treatments under the care of Ismail D. Salahi, D.O. ("Dr. Salahi"). Tr. at 251-53. Dr. Salahi noted that Plaintiff "required continual, around-the-clock narcotic medications." Tr. at 252. Dr. Salahi also noted Plaintiff's medications included Duragesic and Xanax, and past pain medications included Mepergan, Percocet, and OxyContin. Tr. at 252. Dr. Salahi's plan was to wean Plaintiff off of narcotic medications, and he "hope[d] that as the fusion takes that [Plaintiff] will have improvement in his overall pain." Tr. at 253.

Approximately one month after his initial visit, on December 22, 2005, Plaintiff returned to Dr. Salahi and complained of "substantial lower and mid back pain." Tr. at 254. Dr. Salahi's treatment notes reflect that Plaintiff "ha[d] a history of opiate tolerance prior to his fusion[,]" therefore Dr. Salahi refused to prescribe Plaintiff "high quantities of Oxycodone" because he did "not in any way want to undermine the healing of the fusion." Tr. at 254. Dr. Salahi continued Plaintiff on a Duragesic patch. Tr. at 254. On January 25, 2006, Plaintiff advised Dr. Salahi that the medication he was taking was not providing him relief, and "he continue[d] to have severe low back pain." Tr. at 255. Therefore, Dr. Salahi changed Plaintiff's medication to Kadian. Tr. at 255. Two weeks later, Dr. Salahi noted that Plaintiff "ha[d] not had any significant improvement with the Duragesic or Kadian medications." Tr. at 256. Dr. Salahi again changed Plaintiff's medication, placing him on Methadone, and he indicated Plaintiff "underst[ood] that we are rapidly reaching an endpoint with the medications that we can prescribe for his pain." Tr. at 256. After approximately two weeks of being on Methadone, Plaintiff reported that "[h]e d[id] not obtain dramatic relief with the Methadone,

but he d[id] feel that it [wa]s improving his quality of life." Tr. at 257.  Dr. Salahi also noted he was "reluctant to increase [Plaintiff's] medication at th[at] time." Tr. at 257.

On April 18, 2006, Plaintiff was seven months post his second surgery and although Plaintiff "continue[d] to wear a lumbar corset[,]" he did "not require any changes in his medications with the exception of the addition" of a medication to help him sleep. Tr. at 258. Dr. Salahi would not "assign a permanent impairment rating" nor a "work status" because he did not feel comfortable doing so while Plaintiff was still under Dr. Monteiro's care. Tr. at 258.

Plaintiff returned to Dr. Salahi on June 13, 2006, after he had been released from Dr. Monteiro's care. Tr. at 260. After recognizing that Plaintiff was not a surgical candidate, Dr. Salahi indicated he would "proceed forward with aggressive therapy," including "a series of epidural steroid injections." Tr. at 260. Plaintiff received the epidural injections, but they "failed to give him any relief." Tr. at 262. Dr. Salahi and Plaintiff engaged in "a very frank discussion[,]" and they reached the conclusion that Plaintiff was "willing to be as aggressive as necessary" to obtain pain relief. Tr. at 262. Plaintiff reported he still had a poor quality of life, and he could not "perform any gainful employment as a result of [his] pain." Tr. at 263. Therefore, Dr. Salahi performed two trials, one on August 9, 2006 (Tr. at 264-65), and one on September 6, 2006 (Tr. at 266-67), and a subsequent operation on October 25, 2006, to insert an intrathecal pump into Plaintiff's abdomen which would periodically release Morphine. Tr. at 269-70.

During the next several weeks, Plaintiff reported to Dr. Salahi that he was not receiving relief. Tr. at 272-74. On December 19, 2006, Dr. Salahi wrote, "It is puzzling to me as to why [Plaintiff] has not obtained any significant relief despite the repeated large

increases" in the amount of Morphine he was receiving. Tr. at 274. Furthermore, Plaintiff admitted to Dr. Salahi that he was taking "far more Methadone orally than he was admitting to previously." Tr. at 274. Dr. Salahi performed two tests to ensure Plaintiff's intrathecal pump was working properly and concluded that it was functioning properly. Tr. at 274, 275. In addition to the medication being released through the intrathecal pump, Dr. Salahi gave Plaintiff a prescription for Percocet to use for "breakthrough pain." Tr. 275, 286, 288. After multiple increases and adjustments to Plaintiff's intrathecal pump, Plaintiff continued to complain his pain was not decreasing, although he appeared "quite comfortable" at his visit with Dr. Salahi on February 27, 2007. Tr. at 284-91.

On March 13, 2007, Dr. Salahi indicated that Plaintiff had "dramatically improved" after reducing the amount of medication released through the intrathecal pump and placing Plaintiff back on Methadone. Tr. at 291. On April 9, 2007, Plaintiff rated "his pain at 5 out of 10" and that taking Methadone had "dramatically improved his pain scores." Tr. at 292. During the same visit, Plaintiff's intrathecal pump was filled with Dilaudid, which replaced the Morphine, and Plaintiff's Methadone prescription was refilled. Tr. at 292.

During the next approximately two months, the dosage of Plaintiff's medications had to be continually adjusted because Plaintiff was not receiving relief. Tr. at 305-09. Then on July 25, 2007, Plaintiff reported to Dr. Salahi that he "continue[d] to have good relief and d[id] not wish any changes" be made. Tr. at 310. Similarly, on September 10, 2007, Plaintiff had "good relief" but had a "recent increase in pain because of increased activity." Tr. at 312. However, on October 24, 2007, Plaintiff stated his "pain h[ad] increased" so his intrathecal pump was increased by twenty percent. Tr. at 314. During his subsequent four

appointments with Dr. Salahi, Plaintiff reported his pain was not being adequately controlled. Tr. at 316-22. In fact, on January 21, 2008, Plaintiff requested the intrathecal pump be removed. Tr. at 322. On February 20, 2008, Plaintiff stated the "pump provide[d] little relief of pain" but his pain had "improved with the addition of Methadone." Tr. at 324. Plaintiff continued to request that Dr. Salahi remove the intrathecal pump as it was not providing him relief. Tr. at 326. On August 5, 2008, Plaintiff went to Dr. Salahi's office "crying" and was "very sad and emotional" during the visit because "his aunt died[,]" and he was experiencing "out of control" pain. Tr. at 330. During this visit, Dr. Salahi indicated he had "run out of ideas for" Plaintiff. Tr. at 330. Dr. Salahi recommended Plaintiff obtain a second opinion from Riverside Spine. Tr. at 330.

Plaintiff returned to Dr. Salahi on September 3, 2008, and reported that Riverside Spine "had nothing else to offer" him. Tr. at 332. Dr. Salahi noted Plaintiff was "adamantly against detox" and Plaintiff "decided to try Shands [Jacksonville] to try to obtain [a] surgical consult." Tr. at 332. This appears to be the last visit Plaintiff had with Dr. Salahi. Tr. at 332-33. On September 30, 2008, Dr. Salahi completed a RFC Questionnaire for Plaintiff. Tr. at 342-46. In a letter accompanying the RFC Questionnaire, Dr. Salahi stated Plaintiff was not at that time, nor would he be in the future, "reliably, consistently, and predictably" gainfully employed. Tr. at 348.

### **III. The ALJ's Decision**

When determining whether an individual is disabled, an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the plaintiff: 1) is currently employed; 2) has a severe impairment;

-7-

3) has an impairment that meets or medically equals one listed in the Regulations; 4) can perform past relevant work; and 5) retains the ability to perform any work in the national economy.  See 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  The ALJ performed the required five-step sequential inquiry.  At step one, the ALJ established Plaintiff has not engaged in substantial gainful activity since December 6, 2004, the alleged onset date.  Tr. at 62.  At step two, the ALJ found Plaintiff suffers from the following severe impairment:   "lumbar spine disorder status post laminectomy causing chronic pain."  Tr. at 62.  At step three, the ALJ stated Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. at 63.

> The ALJ determined Plaintiff has the RFC to do the following:
>
> [P]erform sedentary work tasks[,] . . . stand/walk 2 hours, allowing for a sit/stand option every 15 minutes for brief periods.  He cannot perform jobs requiring climbing and can only occasionally perform balancing, stooping, kneeling, crouching, and crawling.  He cannot be exposed to dangerous work hazards such as unprotected heights and exposed machinery, and cannot be exposed to extreme heat/cold.  Secondary to his alleged pain, he is limited to routine, repetitive work tasks.

Tr. at 64.  At step four, the ALJ found Plaintiff "is unable to perform any past relevant work."[3] Tr. at 68.  At step five, the ALJ determined Plaintiff is capable of performing jobs that exist in significant numbers in the national economy considering his age, education, work experience, and RFC.  Tr. at 68.  The ALJ identified such jobs as "ticket taker," "paramutual ticket taker," "addresser," and "document preparer."  Tr. at 68-69.  The ALJ concluded

---

[3] As previously stated, Plaintiff's past relevant work includes working as a construction framer and tile setter.  Tr. at 68.

Plaintiff was not under a disability[4] from December 6, 2004 (the alleged onset date) through the date of the decision. Tr. at 69.

## IV. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

---

[4] "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

-9-

## V. Discussion

Plaintiff argues the ALJ erred in three ways: 1) failing to give adequate reasons for discounting the opinion of Plaintiff's treating physician regarding Plaintiff's RFC (Pl.'s Mem. at 20-22); 2) failing to objectively evaluate or specifically articulate reasons for discrediting Plaintiff's pain testimony (id. at 17-22); and 3) failing to include in the hypothetical to the vocational expert all the effects of Plaintiff's impairments and limitations (id. at 22-23). Each argument is addressed in turn.

### A. Opinion of Plaintiff's Treating Physician

With respect to the opinion of one of Plaintiff's treating physicians, Dr. Salahi, Plaintiff argues "the ALJ's statement alleging that Dr. Salahi's opinion of [P]laintiff's functional capacities was inconsistent with the physician's own notes and 'devoid of any explanation, rationale, clinical findings, or reference to objective testing' is simply wrong." Pl.'s Mem. at 21 (quoting Tr. at 67). The Social Security Regulations instruct ALJs how to weigh the medical opinions[5] of treating physicians[6] properly. See 20 C.F.R. § 404.1527(d). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

---

[5] Medical opinions are statements from physicians that reflect judgments about the nature and severity of the claimant's impairment, including symptoms, diagnosis, prognosis, and what the claimant can still do despite the impairment. 20 C.F.R. § 404.1527(a)(2).

[6] A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

evidence" in the record. Id. When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering factors such as the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician. Id.

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records. Phillips, 357 F.3d at 1240-41; see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence). The ALJ must "state with particularity the weight he [or she] gave the different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279-80 (11th Cir. 1987); see also MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

Dr. Salahi began treating Plaintiff on November 29, 2005 (Tr. at 251), and during the span of almost three years, Plaintiff had at least thirty-nine appointments with Dr. Salahi. Tr. at 251-76, 290-94, 308-33. Dr. Salahi completed the RFC Questionnaire for Plaintiff on September 30, 2008. Tr. at 342. In the RFC Questionnaire, Dr. Salahi opined Plaintiff is not a malingerer. Tr. at 343. Additionally, Dr. Salahi's RFC Questionnaire indicates the "clinical

-11-

findings and objective signs" of Plaintiff's chronic pain are supported by a positive MRI, decreased sensation in Plaintiff's right leg, and positive straight leg raises. Tr. at 342. As to Plaintiff's pain and its effects, Dr. Salahi indicated that Plaintiff's pain is "daily, constant, [and] aggravated by any activity[,]" and Plaintiff's pain "frequently" interferes with Plaintiff's "attention and concentration needed to perform even simple work tasks." Tr. at 342, 343. Dr. Salahi further opined that Plaintiff should never lift and carry more than ten pounds and should only rarely lift and carry less than ten pounds. Tr. at 344. Regarding the number of work days Plaintiff will have to miss each month, Dr. Salahi indicated "about four days per month" will be missed. Tr. at 345. In a letter accompanying the RFC Questionnaire, Dr. Salahi expressed his opinion that Plaintiff has reached "Maximum Medical Improvement" and his belief that Plaintiff cannot be "gainfully employable at th[at] time, nor . . . in the future." Tr. at 348.

In discounting Dr. Salahi's opinion, the ALJ indicated "that Dr. Salahi's residual functional capacity assessment was based primarily on [Plaintiff's] subjective symptoms and devoid of any explanation, rationale, clinical findings, or reference to objective testing." Tr. at 67. A review of the RFC Questionnaire, however, indicates that Dr. Salahi opined the "clinical findings and objective signs" of Plaintiff's chronic pain are supported by a positive MRI, decreased sensation in Plaintiff's right leg, and positive straight leg raises. Tr. at 342. Thus, Dr. Salahi appears to have referenced not only clinical findings, but also objective testing. To the extent the Questionnaire required an explanation or a description, Dr. Salahi provided one for each question. Tr. at 342-46. Therefore, the ALJ's reason for discounting Dr. Salahi's opinion on the assessment is not supported by substantial evidence.

Also in discounting Dr. Salahi's opinion, the ALJ relied on a statement made by Plaintiff at the administrative hearing that he can "lift/carry a gallon of milk for brief periods." Tr. at 67. In the RFC Questionnaire, Dr. Salahi indicated Plaintiff can rarely lift and carry less than ten pounds. Tr. at 344. As the ALJ recognized, a gallon of milk weighs about eight pounds. Tr. at 67. Therefore, Plaintiff's testimony appears consistent with that part of Dr. Salahi's RFC Questionnaire, and the ALJ did not point to any evidence to suggest otherwise.

The ALJ further discredited Dr. Salahi's opinion contained within the RFC Questionnaire that Plaintiff will have to "miss 4-5 days" each month of work. Tr. at 67. The ALJ concluded that Plaintiff "will likely miss 1 day/month due to pain[.]" Tr. at 67. However, the ALJ did not state the evidence she relied on to reach that conclusion or why she concluded differently than Dr. Salahi, other than the conclusory statement that "there is no support in [the] record for having to miss 4-5 days" per month. Tr. at 67. Without clear reasons from the ALJ, the undersigned cannot determine if the ALJ's conclusion is supported by substantial evidence.

In addition, the ALJ observed that Plaintiff "did not need to stand/walk every 4 minutes during the hearing" as Dr. Salahi's RFC Questionnaire suggests (Tr. at 67), and that Plaintiff "moved around a bit at the hearing, basically, every 15 minutes . . . [and] appeared uncomfortable, but not to the point that he could not sustain full-time work at a reduced sedentary level." Tr. at 66. Although it is in the province of the ALJ to make observations at an administrative hearing, such observations cannot displace the other evidence.[7]

---

[7] Plaintiff argues the ALJ engaged in "sit and squirm jurisprudence." Pl.'s Mem. at 17-22. "[S]it and squirm jurisprudence" has been described as an approach in which "an ALJ who is not a medical expert will subjectively arrive at an index of traits which he [or she] expects the claimant to
(continued...)

-13-

Regardless, these observations made by the ALJ are only partially correct because the ALJ did not mention that Plaintiff asked to "stand for a minute" (Tr. at 24) during the forty-one minute hearing.[8] Tr. at 9, 48.

Finally, the ALJ concluded that "Dr. Salahi's opinion regarding [Plaintiff's] ability to work and his residual functional capacity assessment [are] not accompanied by objective medical evidence and [are] not bolstered by the record[; therefore,] neither are given controlling weight." Tr. at 67. However, the ALJ's conclusory statement regarding Dr. Salahi's opinion frustrates judicial review because no explanation accompanies the statement. Furthermore, the undersigned's review of the record demonstrates that the conclusory statement does not appear to be supported. Without more, the ALJ's reasons are not sufficient as she did not clearly articulate adequate reasons for discrediting Dr. Salahi's opinion.

The ALJ did not sufficiently enumerate the reasons for discrediting treating physician Dr. Salahi's opinion. On remand, the ALJ shall clearly articulate adequate reasons supported by substantial evidence for discounting Dr. Salahi's opinion, if appropriate.

---

[7](...continued)
manifest at the hearing." Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982). "If the claimant falls short of the index, the claim is denied." Id.; see also Johns v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); McRoberts, 841 F.2d at 1081 (stating "'sit and squirm' jurisprudence has no place in this circuit"). Nevertheless, as the Commissioner recognizes, Memorandum in Support of the Commissioner's Decision (Doc. No. 14; "Deft.'s Mem.") at 8, an ALJ is not prohibited from considering a claimant's appearance and demeanor during the hearing, so long as the ALJ's observations do not displace the other evidence. See Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987).

[8] Although an ALJ is not required to discuss every piece of evidence in a record, an ALJ cannot pick and choose which evidence supports a decision while disregarding evidence to the contrary. McCruter v. Bowen, 791 F.2d 1544, 1548 (11th Cir. 1986).

### B.     Plaintiff's Subjective Pain Testimony

Plaintiff also argues the ALJ's decision "fails to accurately and substantially depict the varying severity and fluctuations of [Plaintiff's] long term pain." Pl.'s Mem. at 16. The Commissioner responds that "subjective complaints alone. . . cannot establish disability." Deft.'s Mem. at 4. "[T]o establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." Holt, 921 F.3d at 1223. Although "credibility determinations are the province of the ALJ," Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005), "explicit and adequate reasons" must be articulated if the ALJ discredits the claimant's testimony. Wilson, 284 F.3d at 1225; see also Dyer, 395 F.3d at 1210; Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (stating that "after considering a claimant's complaints of pain [or other subjective symptoms], the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence").

"When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications; and (5) treatment or measures

-15-

taken by the claimant for relief of symptoms." Davis v. Astrue, 287 F. App'x 748, 760 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)); see also 20 C.F.R. § 416.929(c)(3)(i)-(vi) (providing the same). However, a plaintiff's ability to participate in daily activities for a short duration does not preclude a finding of disability. See Lewis, 125 F.3d at 1441 (finding that participation in everyday activities "such as housework and fishing" is insufficient to disqualify "a claimant from disability").

The ALJ concluded Plaintiff's "medically determinable impairment c[an] reasonably be expected to cause the alleged symptoms[,]" satisfying the first prong of the test; however, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" RFC assessment indicating Plaintiff can "perform sedentary work." Tr. at 67, 64. The ALJ discredited Plaintiff's testimony regarding his pain, even though the ALJ noted Plaintiff's "back pain [i]s constant" and is "a 7 on a scale of 1 to 10, with 10 being the worst" (Tr. at 65), and twice recognized Plaintiff suffers from "chronic pain." Tr. at 65, 67; see also Tr. at 332 (recording Plaintiff's pain as 8 out of 10); Tr. at 330 (recording Plaintiff's pain at 9 out of 10); Tr. at 328 (recording Plaintiff's pain at 7 out of 10); Tr. at 326 (recording Plaintiff's pain at 6 out of 10); Tr. at 324 (recording Plaintiff's pain at 4-5 out of 10); Tr. at 322 (recording Plaintiff's pain at 5 out of 10). In discrediting Plaintiff's testimony regarding his pain, the ALJ relied on Plaintiff's statements that "he watche[s] TV, sees his girlfriend daily, and has friends visit occasionally[,]" and Plaintiff's testimony that "he takes walks around the yard, drives a half mile to the store about once a week, and goes out to eat with his parents once a week."

Tr. at 65. Following the Eleventh Circuit's conclusion in Lewis, however, these daily activities are insufficient to preclude a finding of disability.

>As to Plaintiff's pain treatment, the ALJ stated,
>
>>If [Plaintiff is] suffering from true chronic and severe pain, it seems plausible that [Plaintiff] would want to pursue other non-narcotic pain treatments if his current program was not adequate . . . .
>>
>>. . . .
>>
>>Additionally, his desire to improve his symptoms seems to be lacking to some extent, given his desire to continue taking medications that apparently do not work, yet his lack of desire to try other treatment methods.

Tr. at 66. These conclusory statements are not supported by substantial evidence. The record reflects Plaintiff has not returned to work since his injury in 2004. Tr. at 197, 204. He underwent two invasive surgeries in 2005. Tr. at 202, 234. Plaintiff also attempted physical therapy. Tr. at 195. He had multiple epidural steroid injections. Tr. at 191-94, 195, 251, 260. Additionally, Plaintiff had an intrathecal pain pump implanted in his abdomen. Tr. at 269-70. After all those attempts to relieve his pain, Plaintiff still appeared "fatigued, [and] uncomfortable due to pain" on September 3, 2008, which was approximately three-and-one-half years after his initial injury. Tr. at 332. Dr. Salahi indicated Plaintiff was "adamantly against detox" during his last appointment (Tr. at 332); however, Plaintiff testified at the administrative hearing he had "not yet" tried a non-narcotic medication program. Tr. at 22.

The ALJ further noted in her decision that at the hearing, Plaintiff "expressed disinterest to trying non-narcotic" medications. Tr. at 66. Although this statement may be accurate, when viewed with the other evidence of record, it becomes apparent that Plaintiff has tried such medications (and other treatment regimes) in the past, to no avail. In addition

-17-

to the above-summarized evidence of Plaintiff's treatment attempts, Plaintiff has been prescribed various medications since his injury, including narcotic and non-narcotic medications.[9] See Tr. at 195, 201, 221, 252, 253, 255, 256, 260, 286, 291. Taking into account Plaintiff's testimony, along with Plaintiff's surgical, non-surgical, and medication history, it appears the record contains objective medical evidence to support Plaintiff's testimony regarding his pain and desire to obtain pain relief. To the extent the ALJ found otherwise, the reasons articulated are not supported by substantial evidence. Therefore, on remand, the ALJ shall provide explicit and adequate reasons, supported by substantial evidence in the record, to discredit Plaintiff's subjective pain testimony, if the ALJ decides to discount such testimony.

### C. Hypothetical to Vocational Expert

Plaintiff argues the ALJ erred in formulating the hypothetical to the vocational expert by not "tak[ing] into account an accurate functional assessment incorporating the plaintiff's inability to tolerate the demands of eroded sedentary work" including Plaintiff's "inability to sit for prolonged periods of time," and that Plaintiff's pain would require him to have "excessive absences" from work. Pl's. Mem. at 22. In the fifth step of the sequential evaluation process, an ALJ may pose a hypothetical question to a vocational expert as part of his or her determination of whether the claimant can obtain work in the national economy. See 20 C.F.R. § 416.920(a)-(f). "In order for a vocational expert's testimony to constitute

---

[9] Plaintiff has been on varying medication regimes as a result of his back injury including narcotic and non-narcotic medications such as: Methadone, Morphine, Dilaudid, Lortab, Robaxin (non-narcotic), Percocet, Soma (non-narcotic), Duragesic, Xanax (non-narcotic), Mepergan (non-narcotic), OxyContin, Lyrica (non-narcotic), Lunesta (non-narcotic), Sonata (non-narcotic), and Rozerem (non-narcotic).

-18-

substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Wilson, 284 F.3d at 1227 (citing Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999)); see also Loveless v. Massanari, 136 F. Supp. 2d 1245, 1250 (M.D. Ala. 2001). Similarly, in assessing a claimant's RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8P, 1996 WL 374184 at *5; see also Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990) (stating "the ALJ must consider a claimant's impairments in combination") (citing 20 C.F.R. § 404.1545; Reeves v. Hickler, 734 F.2d 519, 525 (11th Cir. 1984)).

Because of the other errors identified herein with respect to Dr. Salahi's opinion and Plaintiff's subjective pain testimony, on remand, the ALJ shall determine whether the results of a further analysis of Plaintiff's treating physician's opinion and Plaintiff's subjective complaints of pain warrant incorporation of Plaintiff's pain effects in the hypothetical to the vocational expert, and if so, to what extent.[10]

## VI. Conclusion

For the reasons stated herein, it is

**ORDERED:**

1. The Clerk is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g), as incorporated by § 1383(c)(3), **REVERSING** the Commissioner's decision and **REMANDING** this matter with the following instructions:

---

[10] According to the Commissioner, "Plaintiff's case also involves an issue of insured status." Deft.'s Mem. at 4 n.2. Therefore, on remand, the ALJ shall address the issue of insured status if appropriate.

      (A)    Reevaluate the evidence with respect to Dr. Salahi's opinion. If the ALJ decides to discount Dr. Salahi's opinion, adequate reasons supported by substantial evidence should be clearly articulated.

      (B)    Reevaluate Plaintiff's subjective complaints of pain and other symptoms in light of all of the evidence of record and explicitly consider all of the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).

      (C)    Reevaluate the hypothetical question posed to the vocational expert in light of the findings made with respect to Plaintiff's treating physician's opinion and Plaintiff's pain and its limiting effects, and

      (D)    Take such other action as may be necessary to resolve this claim properly.

2.    The Clerk is directed to close the file.

3.    If benefits are awarded on remand, Plaintiff's counsel shall have thirty (30) days from receiving notice of the amount of past due benefits to seek the Court's approval of attorney's fees pursuant to 42 U.S.C. § 406(b). See Bergen v. Comm'r Soc. Sec., 454 F.3d 1273 (11th Cir. 2006).

**DONE AND ORDERED** at Jacksonville, Florida on August 13, 2010.

                                                                     */s/ James R. Klindt*
                                                                       JAMES R. KLINDT
                                                                United States Magistrate Judge

jld
Copies to:
Counsel of Record